Earl, J.
The complaint alleges the incorporation of the defendant bank, and that R. Porter Lee was duly elected president thereof on the 10th day of January, 1882; that on or about the twenty-first day of the same January the plaintiff was solicited by the president of the bank to purchase some of the stock of the bank, and that, as an inducement thereto, the bank, through its president, stated to the plaintiff that it was in a solvent and flourishing condition; that its bad and doubtful debts did not amount in all to the sum of $50,000, and that if it should then be wound up, the stockholders would receive a premium of at least sixty dollars on every one hundred dollars worth of stock held by them; that such representations were false and untrue to the knowledge of the president, and the bank was at the time insolvent; that relying upon such representations, the plaintiff purchased fifty shares of the stock owned by the bank, and paid the bank therefor the sum of $8,000, and received a certificate therefor signed by the president and cashier; that by means of such purchase and the subsequent failure of the bank, the plaintiff became liable to contribute toward the payment of creditors of the bank the sum of $5,000 under the national bank act; that by reason of such purchase and failure the plaintiff has sustained damages in the sum of $13,000; that a receiver of the bank was duly appointed on the 22d day of April, 1882, and that he has filed with such receiver proof of his claim for such damages and demanded of him payment thereof, and has also tendered the certificate of the stock to him and offered to surrender the same, and demanded the sum thereof, which was refused; and the prayer for relief is as foEows: “Wherefore this plaintiff demands *677 judgment against the defendants, declaring the purchase of said stock void and setting the same aside, and for the payment to him out of the assets of said bank as a preferred creditor of the sum of 813,000, with interest as aforesaid from the 21st day of January, Í882, or for such other or further or different relief as to the court from all the facts shall seem adequate, equitable and just.”
It is thus seen that the precise and only cause of action alleged is the damages sustained by the plaintiff in consequence of the purchase by him from the bank of certain shares of its stock belonging to it, which purchase was induced by certain false and fraudulent representations as to its financial condition made on its behalf by its president.
The answer put in issue the ownership and sale of the stock by the bank, and the alleged false representations.
The action came to trial before a judge and a jury, and the following questions were submitted to the jury:
1. Were the representations made by Mr. Lee about the financial condition of the bank at the time of the purchase of the stock to Mr. Prosser false and untrue %
2. Did Mr. Prosser rely upon those representations in the purchase of the stock and believe them to be true 1
3. Was the bank insolvent at the time these representations were made %
i. Did Mr. Prosser make the contract of purchase with Mr. Lee as the agent of the bank %
5. Did the bank own the stock %
6. Did the bank get the money %
The jury answered the first, second and third questions in the affirmative and the other questions in the negative.
Thereupon the trial judge heard further evidence, and subsequently filed his decision containing findings of fact and of law. Among his findings of fact are the following: “ The said bank did not make to said plaintiff, through its president or otherwise, the statements and representations touching the condition of said bank, or in respect to the stock thereof, which are in that behalf in said complaint set up and alleged, or either of them;” “ that said plaintiff did not purchase of said bank fifty shares of its stock, or pay said bank therefor, but he purchased the same of R. Porter Lee and paid him therefor; ” and he found as conclusions of law that the plaintiff was not entitled to the relief demanded by him, and that the complaint should be dismissed.
Thereafter, before the entry of judgment, by the consent of the parties, an order was entered staying further proceedings that the plaintiff might prepare a case and exceptions, as recited in the order, “to the end that all questions of fact in the case, and especially the fourth, fifth and sixth *678 findings of the jury alleged by plaintiff to be irregular and incorrect, may be fully considered by the court prior to the entry of judgment herein.”
The motion for a new trial was subsequently brought on, heard and decided, and thereafter judgment was entered dismissing plaintiff’s complaint. From that judgment plaintiff appealed to the general term, and there the judgment was reversed and a new trial ordered. The order of reversal does not specify that the reversal was upon questions of fact, and, therefore, its justification must be found in some error of law revealed by the record.
Several interesting questions of law are discussed with much ability and learning in the brief of the plaintiff’s counsel, which we do not deem it important to determine. We will assume that if this stock belonged to the bank, and the president disposed of it to the plaintiff, making the representations alleged in the complaint, tliis action could be maintained; and we will further assume that if the president represented to the plaintiff that the stock belonged to the bank, and sold it to him assuming to act for and to represent the bank, the action could be maintained, although the bank did not own the stock.
But the fundamental difficulty with the plaintiff’s case is, that the bank did not own the stock, and that the president did not represent that it owned the stock, nor assume to act for it, or on its behalf, in making the sale thereof to the plaintiff.
The finding of the trial court to this effect, sustained by sufficient evidence, and not reversed at the general term, concludes us.
As to to the ownership of the stock, there is no real dispute upon the evidence. The United States Bank act (U. S. R. S., § 5201), prohibits a national bank from making any loan or discount on the security of the shares of its own capital stock, and from purchasing or holding any of such shares, unless it becomes necessary to prevent loss upon a debt previously contracted in good faith. The capital of the bank was $100,000, divided into one thousand shares óf $100 each. Lee entered the bank in the spring of 1868 as messenger boy, and remained in that position for about three months, when he was made a bookkeeper. Then he became successively teller, assistant cashier, cashier, vi e-president, and finally, on the 10th day of January, 1882, about three months before the failure of the bank, president. On the same 10th day of January, one McKnight was chosen cashier of the bank. At that time Lee owned more than one-half of the capital stock of the bank, and the directors allowed him substantially to control and direct the. financial affairs and business transactions of the bank *679 On the 11th day of January he entered into contract with Mrs. Staggfor the purchase from her by fifty shares of the capital stock of the bank, for the price of $6,500, and to ofitain the money to pay for such stock McKnight at his request made a note for $6,500, which he indorsed and placed in the bank as discount paper. He then drew from the bank $6,500, and paid Mrs. Stagg for the stock, and took a transfer thereof. On the 18th day of January, he bought of one Vought 148 shares of the bank at $160 per share, and to pay for the same he made a call loan from the bank of $23,600, and then obtained a New York draft from the bank, which he delivered to Vought in payment of the stock. The call loan was made to him in the same way that call loans were made to other customers of the bank, but without any security. In purchasing these two parcels of stock he did not assume to act for the bank, but he negotiated for and purchased them in his own name; they were transferred to him individually, and all this stock stood in his name on the books of the bank on the 21st day of January, when he made the sale to the plaintiff. The money received by Lee upon the sale to the plaintiff was used by him to pay the note held by the bank for $6,500, and to apply in reduction of the call loan.
Lee had no actual authority to buy this stock for the bank, and he could have no implied authority to buy it and thus violate the law, and he did not, in fact, buy it for the bank. The evidence tends to show that he purchased this stock for the purpose of getting it out of the hands of persons who were not useful to the bank, and selling it to persons who would be useful, and in this way he expected and intended to benefit the bank and its stockholders. But this did not make the bank owner of the stock or the purchase thereof a bank transaction.
In taking the funds of the bank to make the purchases, Lee committed a breach of trust, and upon familiar principles of law the bank could have followed its funds into the stock before a sale thereof and claimed the same. But it was optional with it whether it would do this or not. It could have relied for indemnity entirely upon Lee and held him as its debtor for the sums taken, refusing to take and allowing him to retain the stock; or it could have treated him as a trustee of the stock for it, and enforced the trust for its benefit by compelling a transfer or sale of the stock for its account. But the bank never claimed the stock; some of it was sold and the proceeds applied in repayment of the sum unlawfully taken from the bank, and thus there is no reason, whatever, for saying that the bank in any way became the owner of the stock. Suppose, instead of *680 buying stock, Lee had bought for himself a steamboat with the funds taken from the bank. It could have followed its funds into the steamboat and claimed the same. But it would not have been obliged to do so, and its option to do so would certainly have been lost when the boat had been sold and the proceeds of the sale used to replace the funds unlawfully taken.
We, therefore, conclude that the bank did not own this stock and had no stock to sell.
There was some evidence that Lee represented that the stock belonged to the bank and that he assumed to sell it for the bank. But such evidence was not conclusive. The trial court found the fact to be otherwise, and its finding does not present an error of law unless it was unsupported by any evidence, or was against the evidence. The finding not disturbed by the general term concludes us if there was any evidence upon which it could properly be based, and that there was such evidence seems to us reasonably clear.
As we have already shown, the stock did not belong to the bank, 'stood on the books of the bank in Lee’s name and was by him transferred to the plaintiff. 'On the face of all the papers it was the individual transaction of Lee with the plaintiff. Independently of the evidence to which we will now call attention, it is highly improbable that Lee would sell his own stock as the stock of the bank. There was no reason for his doing so. The plaintiff wanted to buy the stock and it must have been a matter of utter indifference to him who owned it. All he wanted when he purchased was a good title, and that he could get as well from Lee as owner as from the bank. He had confidence in Lee as he was willing to buy knowing that he had substantial control and management of the bank. There was no motive, therefore, for selling the stock as belonging to the bank, or for making the false representations that the bank had bought the stock and then owned it, and the presumption is very strong that the transaction was what upon the face of the papers it appears to have been. The weight to be given to these facts, inferences and presumptions was for the trial court, and it was to determine whether it was overcome by the other evidence. All the other evidence came from the plaintiff and Lee, who was produced as a witness by him. The plaintiff was an interested witness, and Lee, who had committed a breach of trust, and a crime in unlawfully taking the funds of the bank, and who had by false representations committed a gross fraud upon the plaintiff, was a discredited witness? and it was for the trial court to determine how much credit should be given to the evidence of these witnesses and how much it should weigh against the facts, inferences and pre *681 sumptions referred to; and it would not have been error of law if it had wholly discredited it as it was quite improbable, so far as it tended to show that Lee did the absurd and useless thing of selling his own stock as the stock of the bank. The whole of the plaintiff’s evidence touching the ownership of the stock and the representations of Lee in. reference thereto, is as follows:
“On the 21st of January, 1882, having previously left my bank book at the bank to have some interest credited to me, I called for the book. Mr. Lee apologizingly said that he had instructed the bookkeeper to allow me interest, which the bookkeeper had before stated to me that he was not authorized to do. The bookkeeper brought me my book, with some interest credited to me. I had quite a balance there for me, and, noticing the amount of interest, I thought it small; the rate was four per cent. I had a balance there and I desired to put it into something, and asked Mr Lee if he knew of anything good to buy. In response to that question he said: “We can sell you some of our stock, if you would like.” I inquired how much he had for sale. He replied: “Any portion of fifty shares.” I inquired the price. He said 160; that he had sold a few small lots at that. I asked Mr. Lee if that was not rather steep, a large price. In response to that he said: “We think not. It is precisely the price that the bank took it in at a few days ago, and which such men as S. 0. Barmina and Charles D. Marshall have paid for small lots.”
The plaintiff made no inquiry as to the ownership of the stock, and there was no distinct allegation as to it by Lee; and there was nothing in the conversation or negotiation between them which made the matter of ownership of any importance. The only item of this evidence which really supports the theory of the plaintiff is the alleged representation by Lee that the bank “took it in” a few days before at the same price for which he offered to sell it. Whether that representation was made, whether what Lee said was misunderstood, misapprehended or incorrectly remembered were matters for the determination of the trial court. In that portion of his evidence the plaintiff was not corroborated by Lee. He testified substantially as follows:
“He came in again a day or two after that and asked me if there was any stock of the First National Bank of Buffalo for sale. I told him there was a little in the market, and he wanted to know much it was worth. I told him I had sold some for 160. He wanted to know if that was not pretty steep. I told him we thought it was worth that. He said he had bought a little of the Manu *682 facturers and Traders’ Bank stock and had left an order for more, but he thought he would like to get some of ours. He asked me how the bank was fixed, and I took him into the back room and I think I drew him off an abstract of the statement of the books, and he took it away with him and looked at it over night. He came in the next day and asked if the loans were all good. I told him, ‘You know every bank has some loans that are not good.’ He asked me how much we had that was not good, and I told him if everything came out all right, as I expected, it would be pretty much all good. I think, after hearing his testimony to-day, that he did mention $50,000, and I think that I did tell him if everything did turn out as I expected it would, there would not be more than that amount of bad loans. He handed me a check for $8,000 and told me to make out a certificate for fifty shares.”
Q. What was said by him to you in relation to the ownership of the stock by the bank at that time ?
A. I think I told him “we have the stock.”
“I find upon the transfer book of the bank a transfer of this stock tó Mr. Prosser. The written part of the certificate is in my handwriting, and it is as follows: ‘First National Bank. For value received I hereby sell, transfer and assign to E. S. Prosser fifty shares of the capital stock of the First National Bank, subject to all the conditions and liabilities of the articles of the association and by-laws. Witness my hand in Buffalo this 21st day of January, in the year 1882. R. P. Lee.’ It is not signed as president.” The plaintiff called Lee for further examination before the court after the jury had made their findings and had been discharged, and the following questions were put to him and answers given: “Q. Now, Mr. Lee, in the conversation that took place between yourself and Mr. Prosser in the bank, you may state whether or not you did not use words to this effect: “We have some stock for sale.” In the course of that conversation, were these words used in respect to the question of how much it cost, Mr. Prosser having said, “Don’t you think that is pretty high?” And did you not say, “That is the same price the bank took it in at a few days ago? ”
A. I don’t remember using the expression, “ took it in at a few days ago,” but I could not swear I did not use it.
Q. Did a conversation of that purport take place?
A. Yes sir, of that general purport; these two-last points you have spoken of.
By the court—Mr. Lee, you have said, in a general way, that you have made some statement that was in substance to the effect of what the counsel stated. Did you state, *683 and if you did, tell in what manner you stated to Prosser that this stock belonged to the bank?
A. My best recollection is that I did not use the expression “ of the bank; ” but, my impression is, I used the expression, “we have some stock.” I do not think Mr. Prosser inquired particularly as to who the owner of the stock was.
Q. You do not desire to be understood as swearing that the expression was not used?
A. No, sir; that is my best recollection of it.
It will thus be seen that Lee testifying to the same transaction covered by the plaintiff’s evidence fails materially to confirm him. Taking the evidence of these two witnesses, as they gave it, it is by no means clear that there was any dealing as to any stock of the bank, any representations that the bank owned the stock, or any assumption to sell it on behalf of the bank. But when afi the circumstances, with the inferences, probabilities and presumptions are weighed and considered, we think there was enough to authorize a finding that the stock was not sold as the stock of the bank, and that the dealing of the plaintiff in reference thereto was really as it was actually upon the papers, with Lee as owner.
This conclusion, upon the facts, leaves the plaintiff without the cause of action alleged in his complaint, and it is not important to inquire whether he had any other cause of action against the bank growing out of his purchase of the stock from Lee and the representations made by Lee.
We have carefully examined and considered other exceptions to which our attention has been called, and we do not think any of them point out any error, and they are not of sufficient importance to require any attention here.
The order of the general term should be reversed and the judgment of the trial term affirmed, with costs.
All concur except Huger, Ch. J., not voting.